IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re SIEBEL SYSTEMS, INC. SECURITIES LITIGATION _____/ This Document Relates To:     ALL ACTIONS. _____/ | No. C 04-0983 CRB **MEMORANDUM AND ORDER** |

This is a PSLRA securities fraud class action. The Court previously dismissed the complaint with leave to amend. Now pending for decision before the Court is defendants' motion to dismiss the Second Amended Complaint ("SAC"). After carefully considering the allegations of the SAC and the parties' arguments, and having had the benefit of oral argument, the Court GRANTS defendants' motion to dismiss.

## BACKGROUND

Siebel Systems ("Siebel") provides *e*Business application software, primarily focused on the "customer relationship management" industry. Siebel "was in the business of providing customers with software technology enabling them to possess up to the minute 'real time' knowledge about their business, particularly including their deal pipeline and customer relationships." SAC ¶ 2.

"From 1995 through 2000, Siebel was the fastest-growing company in the history of the software business." Id. ¶ 3. During the first quarter of 2001, however, an industry downturn caused Siebel's stock price to plummet. Nonetheless, from April 2001 to July 20101, Siebel's stock price recorded a 60 percent jump. Id. ¶ 4. The stock then plummeted again, dropping 76 percent from July 2001 to October 2001. Id.

Following this steep drop in the stock price, Siebel began making a series of optimistic statements about Siebel's business, and, in particular, about its new product, Siebel 7. On July 17, 2002, Siebel disclosed that its second quarter revenues fell by more than 15 percent and that its earnings per share were materially short of analysts' expectations. Id. ¶ 20. It also disclosed that Siebel 7 was not doing as well as expected, and that Siebel was laying off 15 percent of its workforce. "Following these disclosures, [Siebel'] common stock dropped 21 % on a huge volume of over 65 million shares." Id. ¶ 23.

## PROCEDURAL HISTORY

This consolidated securities fraud action was filed a year and a half after the July 2002 stock drop. The class period is October 1, 2001 through July 2002. Unlike many PSLRA actions, plaintiffs do not allege that defendants published false financial results; instead, plaintiffs maintain that during the post 9/11 period, defendants painted a falsely positive picture of Siebel by making materially false statements about the following: (1) customer satisfaction and loyalty with respect to Siebel's products and services; (2) the new Siebel 7 product; and (3) Siebel's 2002 business performance.

The Court dismissed the First Amended Complaint with leave to amend. Now pending is defendants' motion to dismiss the Second Amended Complaint.

## PLEADING STANDARD

To state a claim under Section 10(b), plaintiffs must allege: (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which plaintiffs relied and (5) which proximately caused their injury. See DSAM Global Value Fund v. Altris Software, 288 F.3d 385, 388 (9th Cir. 2002). Plaintiffs' SAC must also satisfy the pleading requirements of the PSLRA.

"The PSLRA significantly altered pleading requirements in private securities fraud litigation by requiring that a complaint 'plead with particularity both falsity and scienter.'" Gompper v. Visx, Inc., 298 F.3d 893, 895 (9th Cir. 2002) (citation omitted). "A securities fraud complaint must now 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" Id. (quoting 15 U.S.C. 78u-4(b)(1)). To plead scienter with particularity, "the complaint must 'state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind.'" Id. (quoting 15 U.S.C. 78u-4(b)(2)). In determining whether a plaintiff has sufficiently pled scienter, a court "must consider 'whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that the defendants acted with deliberate or conscious recklessness." Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1230 (9th Cir. 2004).

"On a motion to dismiss, the reviewing court must accept plaintiff's allegations as true and construe them in the light most favorable to the plaintiff." Gompper, 298 F.3d at 896. Under the PSLRA, however, "the court ultimately reviews the complaint in its entirety to determine whether the totality of facts and inferences demonstrate a strong inference of scienter." Id. "[W]hen determining whether plaintiffs have shown a strong inference of scienter, the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs. District courts should consider all the allegations in their entirety, together with any reasonable inferences that can be drawn therefrom, in concluding whether, on balance, the plaintiffs' complaint gives rise to the requisite inference of scienter." Id. at 897.

The SAC is 295 paragraphs and 110 pages long. As a result of the complaint's length, the Court has relied on plaintiffs' Memorandum in Opposition to identify the relevant allegations. See Keenan v. Allan, 91 F.3d 1275, 1278 (9th Cir. 1996) (explaining that a district court may rely on parties and is not required to "scour the record").

3

**DISCUSSION**

Defendants move to dismiss on the ground that plaintiffs have not pleaded false statements with the required particularity and, in any event, have not sufficiently pled scienter.

**I.     False Statements**

**A.     Statements about Siebel 7**

Plaintiffs allege that during the class period plaintiffs made numerous false statements about its new Internet-based software, Siebel 7. The product was launched in November 2001. Defendants represented that Siebel 7: (1) sets the standard, ¶ 158; (2) was a highly accurate sales forecasting tool, ¶ 204; (3) was exceptionally deep in functionality, ¶ 113; and (4) offered a "a clear and easy upgrade path" for customers, ¶ 77.

Plaintiffs also contend that defendants made false representations as to the number of Siebel customers upgrading to Siebel 7: defendants (1) falsely projected that 90 percent of its customers would upgrade to Siebel 7 by December 2002, ¶¶ 77, 120; (2) that Siebel 7 was showing rapid adoption and that its adoption was then accelerating, ¶ 165; and (3) that Siebel 7 was exceeding expectations, id.

Plaintiffs claim all of the above statements were false. Siebel 7 was riddled with defects, was not functional, and was not being rapidly adopted by Siebel's customers; in fact, in July 2002, Siebel announced that only 20 percent of its customers had upgraded to Siebel 7, and that same month it also announced the release of Siebel 7.5, which replaced Siebel 7 in September 2002.

**1.     Siebel 7 functionality**

**a.     falsity**

General expressions of optimism can be actionable under Rule 10b-5. See In re Apple Computer Sec. Litig., 886 F.2d 1109, 1113 (9th Cir. 1989). "A statement of optimism contains at least three implicit factual assertions: (1) that the statement was genuinely believed by the person making it; (2) that there was a reasonable basis for the statement; or (3) that the speaker was not aware of any undisclosed facts tending to seriously undermine

the accuracy of the statement. Such statements are actionable under Rule 10b-5 to the extent that one of these implied factual assertions was inaccurate." In re Caere Corporate Sec. Litig., 837 F.Supp. 1054, 1057-58 (N.D. Cal. 1993).

Nonetheless, "[i]n considering whether the market was misled by a particular statement of optimism, courts should keep in mind that [p]rofessional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives, who have a personal stake in the future success of the company." Id. at 1058 (internal quotation marks and citations omitted). Thus, a statement of optimism may simply be too vague to be actionable. In Caere Corp., for example, the court held that statements which touted new products as "technological advancements," called Caere a market leader in its field, and quoted Caere's Chief Operating Officer as saying that Caere was "well-positioned" for growth, were all too vague to be actionable.

Many of the challenged statements about Siebel 7 are simply too vague to be actionable. Plaintiffs have not pled specific facts that demonstrate that defendants' statement that Siebel 7 "sets the standard" was false. Siebel 7 was the first web-based software in this area; to brag that it "set the standard," even if it was a low standard, is not false. Similarly, plaintiffs have not alleged facts that show that the statement that Siebel 7 was not a highly accurate forecasting tool was false: highly accurate compared to what? Similarly, that some customers were having problems using the program because it was too slow or took too many steps does not make the program a "highly inaccurate" forecasting tool. "Exceptionally deep in functionality" is similarly too vague to be actionable.

    **b.**  **scienter**

Even assuming, however, that plaintiffs have adequately alleged that the above positive statements were false, plaintiffs have not alleged facts which create a strong inference that defendants knew Siebel 7 was a bad product when they were making positive remarks about the software. See Plaintiffs' Opp. at 26-28.

While plaintiffs allege that Siebel itself (which was the first company to upgrade to Siebel 7) was experiencing some problems with the web-based upgrade, they do not allege

5

any specific facts that give rise to a strong inference that the defendants–that is the upper management–knew there were problems of such magnitude that it would make their positive statements false.

First, in paragraph 229, plaintiffs baldly claim that "Siebel's development, testing, introduction, product launch and performance were critical issues respecting which the Company's executive management–and the Individual Defendants in particular–regularly kept themselves informed." This paragraph does not plead particular facts that suggest, let alone give rise to a strong inference, that the individual defendants were in fact aware that Siebel 7 was a disaster.

Second, that one Siebel official, Steve Mankoff, said in April 2003–at least a year after the challenged statements–that Siebel 7 was a "new product with kinks" does not support scienter. SAC ¶ 161. That a new program has kinks does not make a positive statement about the program false. If that were the case, the federal securities laws would prevent software companies from making any positive statements about new software.

Third, that Siebel launched Siebel 7.5 in September 2002 also does not give rise to a strong inference that defendants knew Siebel 7 was a bust at the time they were extolling its virtues. While one can reasonably infer that Siebel 7.5 fixed some of the problems with Siebel 7, such a fix does not mean that defendants' statements that Siebel 7 "set the standard" and was "rich with functionality" were false.

Plaintiffs' reliance on Judge Alsup's decision in In re PeopleSoft, Inc., 2000 WL 1737936 (N.D. Cal. 2000), is misplaced; PeopleSoft actually demonstrates the inadequacy of plaintiffs' allegations. PeopleSoft had issued forecasts for strong growth in 1999 over 1998 and had reported that a key new product was performing well and succeeding in the marketplace. In 1999, however, PeopleSoft fired 800 employees and sacked management, and 1999 revenue did not grow. The district court ruled that plaintiff had pleaded facts sufficient to state a claim that PeopleSoft's forecasts were knowingly false when made. These facts included specific allegations that PeopleSoft's products were "laced with abnormally large number of bugs." The defects with PeopleSoft's products were so bad that

6

major customers were refusing to pay, and even banding together and threatening to sue PeopleSoft. The defects were reported to management, and a major customer, Coca Cola, refused to buy a product because of the product's defects. PeopleSoft field representatives were telling management in loud and "highly confrontational terms" that quotas and budgets could not be met, and in response management fired the naysayers.

The facts alleged in the SAC here are no where near as specific or compelling. There is not a single allegation that any identified customer or even specific Siebel employee complained to *Siebel management* about Siebel 7, let alone that a customer complained that Siebel 7 had an "abnormally large number of bugs." Instead, plaintiffs allege that certain "sources"–former Siebel employees–report that Siebel 7 was "clunky." See, e.g., ¶¶ 49-52. In another paragraph plaintiffs quote an unnamed source who used to be work for a Siebel customer who actually upgraded to Siebel 7. The source told plaintiffs' counsel that Siebel 7 provided minor benefits at a high cost. Id. ¶ 53. But none of these sources allege that they told Siebel management that Siebel 7 was a bad product and that they were not going to upgrade to Siebel 7. In other words, the allegations do not suggest that Siebel management was aware that the problems with Siebel 7 were more than would be expected with a new product.

### 2. Statements about the rate of adoption

Defendants also argue that their November 2001 statement that they expected their current customers to upgrade to Siebel 7 at a 90 percent rate during the next six to nine months, and their February 2002 statement confirming the 90 percent adoption rate by December 2002, are forward looking statements protected under the PSLRA's safe harbor. See 15 U.S.C. § 78u-5(c). Plaintiffs respond that the safe harbor does not apply if the forward looking statement was "made with actual knowledge . . . that the statement was false or misleading." In other words, the issue is whether plaintiffs have pled a strong inference of scienter. Again, they have not.

First, there is absolutely no allegation that suggests that defendants knew the November 2001 projection was false when made: Siebel 7 had not even been released.

7

1  Again, the allegation that Siebel itself may have experienced some bugs with the new
2  program, such as the program "freezing," does not give rise to a strong inference that Siebel
3  management knew the 90 rate adoption rate was false.

4  Second, with respect to the projection made in February 2002, plaintiffs' allegations
5  are again insufficient. Plaintiffs rely heavily on the fact that the actual adoption rate by June
6  2002 was only 20 percent to show that defendants knew in February that they would not meet
7  their 90 percent figure by December 2002. That argument, however, assumes that the rate of
8  adoption would be equal throughout the year; perhaps Siebel was expecting that most of the
9  upgrades would occur in the latter-half of 2002. There is simply no allegation that gives rise
10 to a strong inference that defendants knew by February 2002 that their 90 percent figure was
11 inaccurate.

12 Third, the release of Siebel 7.5 itself does not support a strong inference of scienter.
13 Plaintiffs do not cite any case that suggests that because a software company releases a new
14 improved version of a product that means the company's earlier positive statements about the
15 replaced product were false.

### B. Customer satisfaction statements

On April 17, 2002, and in its March 29, 2002 Annual Report, Siebel stated that it had the "highest customer satisfaction and loyalty levels in the IT industry." Plaintiffs' Opp. at 41. Siebel supported its statements by referring to "an independent audit by SatMetrix Systems, Inc. completed in September 2001" that showed that "ninety-six percent of Siebel Systems' customers reported that they intend to purchase additional software from the company." SAC ¶ 64.

Plaintiffs allege that defendants' statements about the survey results (and thus its statements about customer satisfaction and loyalty) were false and misleading. They do not contend that the actual survey results showed something different from what defendants' reported; instead, they argue that the survey was purposefully biased and unreliable and therefore Siebel could not have reasonably relied upon the survey results. This argument tends to mix scienter with falsity—the statements cannot be false unless the allegations

8

support an inference that defendants purposefully biased the survey so that it would provide them with false positive results. The logical way to analyze this issue, then, is through the scienter lens: have plaintiffs pleaded facts that give rise to a strong inference that defendants intentionally created a biased and skewed survey?

### 1. Plaintiffs' scienter allegations

First, plaintiffs cite to a June 2002 survey of a limited number of Siebel customers conducted by an independent research firm, Nucleus Research. SAC ¶¶ 63-76. According to Nucleus, "not one of the customers interviewed had a positive comment about the usability of Siebel." Id. ¶ 71. Many customers had other negative comments. An August 2002 survey (again, performed nearly a year after the SatMetrix survey) on 88 Siebel customers showed Siebel performing poorly compared to its competitors. Id. ¶ 74.

Second, plaintiffs complain that (1) the surveys were not anonymous; (2) Siebel told SatMetrix which persons to contact; (3) Siebel helped formulate the questions; (4) Siebel owned part of SatMetrix (and had one overlapping director); (5) the survey questions had a tricky logic that virtually guaranteed positive results; and (6) plaintiffs' own survey expert retained for this litigation opines that the survey was not statistically valid.

Plaintiffs also complain that Siebel sent its customers a letter asking for the customers' participation in the survey. The letter stated:

> Our goal is 100% customer satisfaction . . . we take your feedback very seriously, it is the primary way we determine where to invest, measure the success of our business and compensate our colleagues. As a small token of appreciation for completing this survey, we will send a Siebel clock to all respondents who complete the survey by Friday, November 30, 2001.

SAC ¶ 128.

Third, some Siebel employees' compensation was dependent upon customer satisfaction, and after Siebel identified negative responses to the survey, its sales managers were required to call the customer to "get to the bottom of it." SAC ¶ 144.

### 2. Analysis

The above allegations do not demonstrate that defendants knew the survey results were bogus. The surveys performed by third parties several months after the SatMetrix

9

survey do not give rise to a strong inference that defendants knew their customer satisfaction statements were false; the surveys merely show that others who performed their own surveys asking different questions of perhaps different people who work for some of Siebel's customers gave answers which were not necessarily consistent with defendants' statement. Plaintiffs do not cite any case in which such hindsight survey results gave rise to a strong inference that a defendant knew a statement was false when made.

Plaintiffs other allegations are trivial. The letter to Siebel's customers gives rise to an inference that Siebel was attempting to get as much participation in the survey as possible, not that it was trying to skew the results. Similarly, that Siebel would instruct its managers to respond to negative comments by "getting to the bottom of it," and would compensate its employees based, in part, on customer satisfaction, suggests that customer satisfaction was important to Siebel and, in fact, also suggests that defendants actually believed they had high customer satisfaction. These allegations do not create a strong inference that defendants intentionally created a biased and inaccurate survey.

The only specific allegation that comes close to suggesting scienter is found in paragraph 138. Plaintiffs allege that Source 13, an employee of a former Siebel customer who actually participated in the SatMetrix survey, provided a negative response to the question of whether the customer was planning to continue purchasing Siebel products. Source 13 says he subsequently received an email from Siebel asking him to change his response to "yes." When he refused, a Siebel salesperson called Source 13's management and had the survey reassigned to Source 13's manager. Source 13 claims his lost his job over this incident. SAC ¶ 138.

If plaintiffs specifically alleged that Siebel management knew that its salespersons were "strong arming" customers to change their results, such allegation might support an inference of scienter. Paragraph 138, however, describes only one incident, and there is no allegation in paragraph 138 or elsewhere in the SAC that suggests that anyone in Siebel management knew about such tactics. Plaintiffs do not even identify the customer; thus, the Court cannot infer that Mr. Siebel would have been aware of this customer's response.

10

Moreover, the allegations themselves do not make any sense. Plaintiffs do not explain why the customer would fire its employee for giving a truthful negative response. Nor do they explain why the customer changed its response. They also do not explain why the customer would care about its relationship with Siebel if Siebel's products were so unsatisfactory.

In sum, plaintiffs' allegations--taken individually or as a whole--do not give rise to a strong inference that defendants knew the survey was hopelessly biased and faulty.

### C.    Revenue Statements

#### 1.    January 27, 2002 optimistic statements

In January 2002, Siebel announced that its revenue for the 4th quarter 2001 ending December 31, 2001 increased 12 percent over the third quarter 2001. Plaintiffs do not challenge this revenue statement; instead, they contend that the following optimistic statements made in connection with the revenue announcement were false: (1) Siebel was looking "pretty healthy;" (2) its business and momentum had regained steam; (3) its current performance was a basis for optimism about 2002; (4) a shift in buying patterns and business customers began in November and continued through January 2002; (5) sales activity had improved and the pipeline of potential deals had strengthened; and (6) Siebel was seeing a return to more normal business processes and buying behavior. Plaintiffs' Opp. at 36 (citing SAC ¶ 13).

Plaintiffs allege these statements were false because defendants actually knew that business was not looking up and, in fact, the pipeline of new deals was declining rather than increasing. The lynchpin of plaintiffs' theory is their allegation that in order to make it look like the new year was starting stronger than it actually was, defendants delayed the closing of at least $50 million worth of older deals from the fourth quarter 2001 to the first quarter 2002. Plaintiffs do not claim it was improper to recognize the revenue in the new quarter; instead, they contend that defendants' deliberate delay of the closings demonstrates that defendants knew Siebel's business was slowing, not growing.

#### a.    falsity

11

Many of the challenged statements are too vague to be actionable. In the Court's order dismissing the First Amended Complaint the Court explicitly stated that the statement that Siebel was "pretty healthy" was too vague to be actionable; yet, plaintiffs have included the statement again without adequately explaining how such a vague statement can be actionable under the PSLRA. The same analysis applies to the statement that Siebel's business had "regained steam."

### b. scienter

Even if plaintiffs had adequately alleged falsity, they have not pled facts that give rise to a strong inference that these optimistic statements were made with an intent to deceive the investing public.

Plaintiffs' revenue cushioning allegations are based entirely on confidential sources. SAC ¶¶ 93-107. As one court in this Circuit has explained:

> Plaintiffs are not required to name witnesses. To contribute meaningfully toward a "strong inference" of scienter, however, allegations attributed to unnamed sources must be accompanied by enough particularized detail to support a reasonable conviction in the informant's basis of knowledge. Plaintiffs must plead with substantial specificity how confidential witnesses came to learn of the information they provide in the complaint. The Court must be able to tell whether a confidential witness is speaking from personal knowledge, or merely regurgitating gossip and innuendo. The Court can look to the level of the detail provided by the confidential witnesses, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.

In re Metawave Communications Corp., 298 F.Supp.2d 1056, 1068 (W.D. Wash. 2003) (internal quotation marks and citation omitted); see also Oracle Corp., 380 F.3d at 1233 (stating that "personal sources of information relied upon in a complaint should be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged'") (citation omitted).

Plaintiffs' confidential witness allegations do not give rise to a strong inference that defendants engaged in revenue cushioning to improve the first quarter. None of the anonymous sources was in a position to possess personal knowledge of their allegations.

12

For example, plaintiffs allege that Source 8–a former manager in Siebel's Financial Planning and Analysis Group–told plaintiffs' counsel that $50 million in deals was pushed into the first quarter 2002; yet, Source 8 did not identify a single deal or any specifics of any deal, or any other facts that suggest that Source 8's statement is anything other than speculation. SAC ¶¶ 95-97.

Source 1 is a former Siebel Alliances Group Business manager who was part of a "technical group supporting the sales force." Source 1 claims that "any decision to push sales up form one quarter to the next necessarily involved CEO Siebel and had to occur on the last day of the quarter." SAC ¶ 98. The complaint is utterly devoid of any facts that hint as to how Source 1 knew of Siebel's alleged involvement; thus, Source 1's allegations do not contribute to an inference of scienter.

The same analysis applies to Source 9. SAC ¶¶ 99-106. Source 9 was a former manager of sales operations for Siebel. His group "tracked Siebel sales force inputs for sales opportunities, leads, wins and also managed applications related to Siebel's SFA tools, such as forecasting, sales reporting and analysis. Id. ¶ 99. Source 9 claims that "at the direction of defendant Siebel, Siebel's executive management 'pushed out' certain deals that were ready to be closed in 4Q'01." Id. ¶ 100. There are no allegations, however, that suggest how he or she would know such a fact. Moreover, while Source 9 actually identifies two deals that were allegedly pushed back (General Motors and General Electric), he does not identify any facts that suggest the revenue should have been recorded in December, that is, that the deals *could have* closed in December; instead, it appears that Source 9's knowledge comes from the fact that his group assembled large notebooks of data concerning the deals. Id. ¶ 100. Also, Source 9 reports that he "recalls that in December 2001, Siebel did have signed contracts" with General Electric and General Motors, id. ¶ 101, but he does not explain what his recollection is based upon. The allegations of the SAC, however, make it clear that his recollection is not based upon his personal involvement in those deals.

Source 4 was an independent consultant for Siebel during the class period, but had not been a Siebel employee since 1999. SAC ¶ 107. Source 4 claims the General Electric deal

13

was set to close in December, but, again, there are no allegations as to how this independent consultant in IT implementation would have any personal knowledge of such fact; indeed, the remaining allegations reveal that Source 4's allegations are all based on information Source 4 learned from other unnamed individuals who may or may not have any first hand knowledge.

Finally, Source 10, a former credit department employee, claims that on the last day of the fourth quarter 2001, Siebel executives held a conference call to decide which deals to close and which to hold. The complaint alleges that "Source 10 recalls that defendant Goldman made the decision to delay shipment of several orders until the following quarter." Id. ¶ 103. Again, there is not a single allegation as to how Source 10 "recalls" such information. The inference drawn from the SAC is that Source 10 was not a participant in the meeting (as Source 10 was a credit department employee, not an executive).

In sum, the allegations of the SAC do not give rise to a strong inference that defendants intentionally moved deals from the fourth quarter 2001 to the first quarter 2002 so that they could make it look like the first quarter was performing well.

Plaintiffs' allegations as to declining quotas and Siebel "strong arming" its vendors to purchase Siebel products, SAC ¶¶ 104-106, 108-109, also do not give rise to a strong inference that defendants knew Siebel was not "pretty healthy" and had not "regained steam." Again, the allegations lack specifics that give rise to a strong inference of scienter: for example, Source 9 has no first hand knowledge of his or her allegations. SAC ¶ 105 ("Source 9 *learned* that in this meeting . . .") (emphasis added).

### 2. April 17, 2002 announcement

On April 17, 2002, Siebel announced the results for the first quarter 2002 ending March 31, 2002. Siebel reported earnings per share of $0.12. Plaintiffs do not challenge this reported revenue; instead they challenge defendants' statements that (1) Siebel had a very strong January, and that month was "unusually strong;" (2) licensing revenue for the new quarter would be flat; and (3) the pipeline of expected transactions for the second quarter was larger than for the first quarter. Plaintiffs' Opp. at 37.

14

### a. January was unusually strong

Scienter with respect to the first statement depends on the revenue cushioning allegations and, as is explained above, the allegations are insufficient to support a strong inference of scienter with respect to when revenue was recognized.

### b. licensing revenue would be flat

The second statement, that licensing revenue for the new quarter would be flat, is a projection protected by the safe harbor provisions; thus, it is actionable only if plaintiffs allege specific facts that give rise to a strong inference that defendant knew the statement was false when made. See In re Daou Systems, Inc., 411 F.3d 1006, 1021 (9th Cir. 2005). Again, plaintiffs' scienter argument is premised on the alleged revenue cushioning; as the allegations are insufficient to support a strong inference of intentional revenue cushioning, the complaint does not give rise to a strong inference that defendants knew their "licensing revenues flat" projection was false.

Likewise, the allegations that sales quotas were reduced and that by April 2002, revenues in the Western region were trailing by 20 percent, do not mean that defendants knew that by the end of June licensing revenues would decrease rather than be flat. Similarly, while the allegation of reduced quotas for salespersons, SAC ¶¶ 108-109, suggests that defendants were aware that sales for 2002 were slow compared to 2001, that allegation alone is not enough to give rise to a strong inference that defendants knew that the second quarter would be worse than the first. Indeed, the complaint alleges that in the last quarter of 2001 nearly 50 percent of the sales persons did not meet their quotas, ¶ 108; yet, in that quarter Siebel beat analysts' expectations and, according to plaintiffs, did so well that they were able to push revenue from that quarter to the next quarter.

The "bartering" allegations also do not support an inference of scienter. Plaintiffs allege that defendants were forcing Siebel's vendors to buy Siebel products even if the vendor did not need the products. SAC ¶¶ 109-110. Such allegations are, again, based on accounts from persons without any first hand knowledge. There are no allegations that persuasively suggest that Siebel was "threatening" its customers to buy Siebel products that

they did not need. Moreover, Siebel's public filings disclosed when it had engaged in transactions with existing customers. Request for Judicial Notice Exh. G-I. The fact that Siebel engaged in such transactions does not suggest that defendants knew that business was declining.

Plaintiffs are simply alleging fraud by hindsight; because the second quarter revenues fell by 15 percent plaintiffs conclude that defendants must have known in April that such a decline would occur. The Court is not persuaded.

### c. pipeline of expected transactions was larger

Plaintiffs appear to contend that defendants knew the statement about the pipeline of deals was false because of (1) the revenue cushioning; (2) the reduced sales quotas; and (3) Siebel "bartering" deals from its vendors. As is explained above, none of those allegations is specific enough to give rise to an inference of scienter.

### 3. June 12, 2002 Statements

Eighteen days before the end of the second quarter, Siebel Chief Financial Officer Goldman told analysts attending a Bear Stearns Technology Conference that Siebel's second quarter showed "little sign of improvement over" the first quarter, and that the second quarter is "every bit as challenging." SAC ¶ 178. Plaintiffs claim these statements–which they claim implied Siebel would do the same as it had done the quarter before–were false for several reasons.

Their primary argument is that on July 17, 2002–just one month later–Siebel reported that second quarter revenues were not flat, but instead fell 15 percent from the previous quarter. It also announced that only 20 percent of the company's customers had migrated to Siebel 7, and that it intended to lay off approximately 15 percent of Siebel's employees. Siebel also slashed revenue forecasts for the remainder of 2002 by 25 percent. SAC ¶¶ 187-189. Plaintiffs contend that defendant Goldman must have known about this dire financial situation on June 12 when he reported that the second quarter showed little improvement over the first. Indeed, in a conference call following its earnings announcement, defendant Siebel admitted that the "'last couple of months' had clearly indicated that the second quarter

16

IT environment was tougher than the first quarter." Id. ¶ 192. Siebel also acknowledged that in hindsight, "it is clear we should have" reduced headcount at the end of the previous year. Id.

This allegation, too, fails. First, plaintiffs have failed to allege particular facts that show that Goldman's June 12 statement was false. Goldman did not report that Siebel was predicting that revenues would be flat with the previous quarter; instead, he reported that revenues showed "little sign of improvement" over the first quarter. Such a response means that revenues would not be not greater than the previous quarter; it is not a representation that revenues would "be flat." "Little sign of improvement" can include no improvement or even a decline.

Second, plaintiffs have again failed to plead specific facts which give rise to a strong inference that at the time Goldman made the June 12 statement he knew that when the quarter ended 18 days later revenue would decline significantly from the previous quarter. Siebel's July 17 announcement that it was laying off employees does not give rise to such an inference; to the contrary, it is reasonable to expect that *after* the quarter closed and Siebel computed its final numbers it realized it had to reduce its head count and set out to do so. Plaintiffs do not plead any facts that suggest that on June 12 Siebel had to have known it was going to lay off employees; indeed, plaintiffs allege that Siebel reported that it should have performed lay offs earlier. Id. ¶ 192. This statement suggests that Siebel management *did not* realize how poorly the company was performing.

Nor do plaintiffs plead any facts that suggest defendant Goldman had to have known that revenue would decline. It is common knowledge that high tech companies complete many deals in the last few days of a quarter in order to meet revenue projections. Plaintiffs do not make any allegations that give rise to a strong inference that on June 12 Goldman *knew* that by the end of the quarter revenues would not be flat. That Siebel had sophisticated software that allowed it to track sales, revenue and similar information in real time is insufficient to support a strong inference of scienter.

//

17

## II. Stock sales

Plaintiffs argue in their Opposition that defendant Goldman's (but not the other two individual defendants') sales of stock give rise to a strong inference of scienter. Opposition at 28-29. Goldman sold 33 percent of his holdings during the class period, with most of those trades occurring the week following the announcement of the fourth quarter results. SAC ¶ 251-52. None of the sales occurred around the time of Goldman's June 12 statement.

While such sales might give rise to an inference that defendant Goldman (but not the other defendants) had some material adverse information, the complaint fails to allege with particularity what that adverse information was. As previously explained, the "revenue cushioning" allegations are all based on second, third and fourth hand information and are therefore not persuasive. Goldman's somewhat suspicious stock sales are simply insufficient to overcome the SAC's pleading deficiencies. See In re Silicon Graphics Inc. Securities Litig., 183 F.3d 970, 986-88 (9th Cir. 1999).

## III. Totality of the allegations

Even when the Court considers the allegations of the SAC in their totality, plaintiffs have not satisfied the PSLRA.

First, many of the statements, such as that Siebel is "pretty healthy," are far too vague to be actionable.

Second, the complaint is devoid of allegations that give rise to a strong inference that the individual defendants (1) knew Siebel 7 had serious and unusual problems; (2) intentionally pushed revenue into the first quarter of 2002 in order to make the company's prospects look better; (3) believed Siebel's customer satisfaction survey was a sham; or (4) knew in April 2002 that the second quarter was going to be materially worse than the first. Plaintiffs do not have any sources with first hand knowledge of what the individual defendants allegedly knew. None of the sources were in a meeting with defendants or personally overhead a conversation of any of the defendants, and none of the sources reviewed any documents that specifically contradict the statements at issue.

Third, plaintiffs' heavy reliance on <u>Oracle Corp.</u>, 380 F.3d 1226, is misplaced. There the court held that "[c]onsidered separately, Plaintiffs' allegations may not create a strong inference of scienter." <u>Id.</u> at 1234. It concluded, however, that the totality of the allegations created a strong inference that defendants had made a false forecast regarding the third quarter. That totality included four factors. First, Larry Ellison's highly suspicious sale of $900 million in stock, his first sale in five years. <u>Id.</u> at 1232. Second, *early* in the quarter Oracle had lost or delayed a number of large deals; thus, when it made its forecast it knew of the lost/delayed deals. The complaint even included allegations as to the amount of those lost deals. And the complaint alleged that Ellison had acknowledged that he was involved in those deals. <u>Id.</u> at 1231-32. Third, Oracle admitted that going into the third quarter it knew it had bugs with one of its products and that the dot-com segment was slowing down. <u>Id.</u> at 1232-33. Fourth, and to the Ninth Circuit most importantly, there were specific allegations that in the second quarter Oracle had improperly recorded as revenue $230 million of overpayments from customers. The improper revenue recognition allegations were supported by witnesses who were in a position to know Oracle's accounting practices and, "more importantly," were supported by the debit memos themselves that showed that Oracle credited the overpayments as revenue. <u>Id.</u> at 1233-34.

Here, in contrast, at most plaintiffs have alleged somewhat suspicious stock sales by the CFO (and no other officers) as well as that the Siebel 7 upgrade was experiencing bugs; the SAC before the Court does not have any other specific allegations similar to those made in <u>Oracle</u>. There are no allegations of improper revenue recognition and there are no allegations as to specific "deals" that were lost or delayed such that Siebel should have known that its second quarter revenues would not be flat.

//
//
//
//
//

19

**CONCLUSION**

This case presents the classic "fraud by hindsight." As plaintiffs have been unable to meet the PSLRA's pleading standard after twice amending their complaint, this action is DISMISSED without leave to amend.

**IT IS SO ORDERED.**

Dated: December 28, 2005

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

G:\CRBALL\2004\0983\orderofdismissal.wpd